**ORIGINAL**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

BRIAN LEHMAN,

*individually and on behalf of others similarly situated,*

Plaintiff(s),

-- against --

RICHARD A. BROWN, SCOTT E. KESSLER, THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, JOHN TRAVAGLIA, BRIAN TITTERTON, FRANCISCO M ARIA, VICTOR CASTILLO, and UNKNOWNS 1-10.

Defendants.

---

COGAN, J.

CV 18 - 706

**COMPLAINT**



RECEIVED FEB - 1 2018 PRO SE OFFICE

Plaintiff brings this action under 42 U.S.C. § 1983 seeking redress for violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution on his own behalf and on behalf of other similarly situated. Plaintiff hereby alleges:

**PRELIMINARY STATEMENT**

1. This is a civil rights action seeking a declaratory judgment and an order enjoining unconstitutional conduct, as well other relief that may be deemed just and proper, against the Queens Country District Attorney, the City of New York, the New York Police Department and related individual defendants who are employed thereby, individually and in their official capacities, for the policy or practice of relying on the gender of the complaining witness when complaints of domestic violence assault are investigated and prosecuted.

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4).

3. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (b)(2) because the events giving rise to the claims occurred within this district.

4. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

## PARTIES

5. At all relevant times herein, Plaintiff resided in Queens, New York.

6. At all relevant times herein, Richard Brown was, and still is, the District Attorney for Queens County. Defendant Brown is responsible for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs related to the investigation and prosecution of criminal actions in Queens County and for the supervision and training of the staff of the District Attorney's Office. Defendant Brown has been District Attorney of Queens County since 1991.

7. At all relevant times herein, Defendant Scott Kessler was, and still is, the bureau chief of the domestic violence bureau in the Queens County District Attorney's Office. Defendant Kessler is responsible for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs related to the investigation and prosecution of criminal actions related to domestic violence in Queens County and for the supervision and training of the staff of the in the domestic violence bureau. Defendant Kessler has been an Assistant District Attorney in Queens County since 1988.

8. Defendants Richard Brown and Scott Kessler are collectively referred to as the "DA Defendants" in this Complaint.

9. Plaintiff's claims are brought against the DA Defendants individually and in their official capacities.

10. At all relevant times herein, Defendant City of New York was and is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

11. At all relevant times herein, Defendant New York Police Department ("NYPD") was, and still is, an agency of the City of New York created and organized by virtue of the laws of the State of New York.

12. The NYPD is structured into bureaus and units and headed by the Police Commissioner. The NYPD's Patrol Services Bureau plans, directs, and coordinates the Department's uniformed officers in law enforcement patrol operations. Under the Chief of Patrol, there are eight Borough Commands, usually headed by an Assistant Chief. Queens has two Borough Commands: Queens South and Queens North. The 108th Precinct is located in Queens North.

13. At all relevant times herein, Defendant John Travaglia was commander of the 108th Precinct in Queens, New York. Defendant Travaglia has been working for the NYPD since 1993.

14. Upon information and belief, all Precincts in Queens have two officers on duty for calls related to domestic violence who have received training with, among others, the District Attorney's office.

15. At all relevant times herein, Defendant Brian Titterton was a police officer in the 108th Precinct until he resigned on or about October 16, 2015, while under investigation by the Civilian Complaint Review Board ("CCRB").

16. At all relevant times herein, Defendant Francisco Maria was a police officer in the 108th Precinct.

17. At all relevant times herein, Defendant Victor Castillo was a detective in the 108th Precinct. As explained below, the CCRB referred an investigation of Detective Castillo to the Internal Affairs Burrea (IAB under case #201508346).

18. Non-Party Francois (last name, unknown first name) was a police officer in the Special Victim's Unit of New York County on March 3, 2015.

19. Unknown Defendants 1-10 are assistant district attorneys, NYPD employees or employees of the City of New York involved in the allegations stated herein whose names and roles are unknown without the aid of discovery.

### BACKGROUND ON QUEENS DOMESTIC VIOLENCE PROSECUTION BUREAU

20. Defendant Brown created a Domestic Violence Bureau in 1997. A specialized court, the Queens Domestic Violence Court also opened in 1997. It consists of two parts, AP4 and QDVC. AP4, the all-purpose part, handles sentencing, bench trials and the monitoring of some cases; it hears misdemeanor cases through plea or bench trial and felony cases through indictment or felony waiver plea. QDVC, which is staffed by a judicial hearing officer, monitors most compliance cases.

21. The court operates under two grants, one of which is received through the District Attorney's Office.

22. The bureau is staffed by approximately nine misdemeanor assistants. Prosecution is vertical, meaning the assistant who interviews a complaining witness (*i.e.*, complainant) also appears at arraignment and for all future appearances.

23. When police officers in Queens make domestic violence arrests, they immediately page the Domestic Violence Bureau. During regular business hours, ADAs from the Domestic Violence Bureau are on-call and available to meet immediately with complainants, off-site if necessary. As a result, ADAs usually make contact with the complainant within one hour of the incident.

24. Misdemeanor arrests made during nights and weekends are handled by the District Attorney's general intake process. Intake speaks with the complainant, then refers the case to a Domestic Violence Bureau ADA on the next business day. The assigned ADA will then speak to the complainant and the police officer, and may also collect some evidence, usually digital photographs. Once the ADA has spoken with the complainant and reviewed all of the evidence, she decides whether or not the case is appropriate for prosecution.

25. The assigned ADA is responsible for drafting the accusatory instrument. In addition, these ADAs follow up with the complainant regarding adjournment information and the order of protection.

26. Defendant Kessler joined the domestic violence bureau as a supervisor when it was created in 1997 and became its chief in 2000.

**ALLEGATIONS RELATED TO INCIDENT ON FEBRUARY 2, 2015**

25. On or about March 21, 2011, Plaintiff suffered a severe injury at the base of his spine, the L5-S1 vertebral segment.

5

26. There is a large nerve group that passes from the spinal canal through an opening in the back of the L5-S1 muscle groups segment and runs down the back of each leg (as part of the large sciatic nerve). This nerve is called the S1 nerve root. It can lead to severe leg pain if any structure presses against it or if the highly inflammatory proteins from the inner portion of the L5 disc leak out and touch it.

27. On March 21, 2011, Plaintiff suffered a rupture of disc material onto the S1 nerve root.

28. On August 1, 2011, Plaintiff was so debilitated from the pain that he resigned his job. Plaintiff subsequently had three surgeries on his back and spine and continued to suffer substantial, sometimes debilitating, pain.

29. On July 5, 2012, Plaintiff married his then-wife (hereinafter "AB").

30. On or about January 3, 2015, Plaintiff told AB that he wanted a divorce.

31. After January 3, 2015, AB moved out and Plaintiff and AB separated.

32. On January 5, 2015, AB informed Plaintiff that she was six (6) weeks pregnant.

33. AB subsequently found out she was pregnant with twins.

24. After finding out she was pregnant with twins, AB repeatedly asked Plaintiff if he would agree to put the twins up for adoption.

25. Plaintiff repeatedly stated he did not want to give away his children and did not want put the twins up for adoption. Plaintiff stated he would take care of the twins himself.

26. Plaintiff subsequently began planning to take sole care of the twins and informed AB of such plans.

6

27. On February 2, 2018, Plaintiff met with AB to discuss child-care and divorcing him in mid-town Manhattan. AB again asked Plaintiff to put the twins up for adoption. Plaintiff repeatedly stated that he did not want to "give away his children."

28. After meeting, Plaintiff took a taxi to his apartment in Queens. AB took a separate taxi and met Plaintiff half a block outside his apartment.

29. AB asked to go inside the apartment. Plaintiff stated that he did not feel comfortable with AB being in the apartment and stated he would talk with AB's lawyer about delivering the items to her. When AB asked again because she wanted her jewelry, Plaintiff flippantly responded that it did not matter because he had given the jewelry away. Plaintiff's tone was sarcastic as he had not given away the jewelry, nor otherwise harmed AB's property, but was attempting to draw an analogy with giving away the children, which did not bother AB.

30. AB began hitting and, in addition, kicking Plaintiff towards the groin. AB was aware of Plaintiff's multiple surgeries and severe weakness in Plaintiff's back and spine.

31. Plaintiff responded by pushing AB into a snow bank and yelling for AB to leave him alone. AB got up from the snow bank and left.

33. Approximately half and hour later, Plaintiff emailed AB, "I want you to have your stuff, but it is unacceptable for you to kick me and knee me repeatedly (towards the groin especially) in the street when I am trying to talk to you . . . ." Plaintiff also wrote, " . . . . Please have your attorney contact me via email and I will gladly work with him on getting your stuff back. I would like this separation and divorce to be as smooth as possible."

34. AB responded at 8:47 PM via email, "Thank you. I am sorry for kicking and kneeing you. It was not appropriate and it escalated things. I will have [my attorney] contact you tomorrow to arrange a time for me to get my things." That night, at 12:45 AM, AB further wrote

Plaintiff "I was angry tonight after you said that you put my jewelry out on the street and a woman took it. Then, you told me that you smashed all my Christmas ornaments. I slapped you and 4 times kneed you in the groin area. Then you got physical with me."

35. Plaintiff later learned that AB had gone to the 108th Precinct and talked with Defendant Titterton and Defendant Maria.

36. AB admitted to Defendant Titterton and Defendant Maria that she had hit and repeatedly kicked Plaintiff.

37. Defendant Titterton had AB fill out an incident report and instructed her to leave out the admission that AB had repeatedly kicked Plaintiff in or near the groin area but admit that she slapped and hit him.

38. Nine days later, Defendant Titterton contacted Plaintiff and said he should "turn himself in."

39. On February 12, 2015, Plaintiff went to the 108th Precinct and asked for Defendant Titterton.

40. Defendant Titterton and Defendant Maria introduced themselves. Defendant Titterton explained that he was going to arrest Plaintiff.

41. After Plaintiff turned over his on-person property, Defendant Titterton and Defendant Maria brought Plaintiff to the holding cell. As he opened the door, Defendant Maria apologized to Plaintiff stated, "I'm sorry about this. It's just our policy to do this kind of thing when a woman makes a complaint." Plaintiff responded quizzically, "Your personal policy?" Defendant Maria responded, "No, Queen's policy." Defendant Maria stated he knew "what really happened." Plaintiff asked if he could press charges given these admissions, and

8

Defendant Maria stated no. Plaintiff asked why, and Defendant Maria stated "it's just our policy." Defendant Maria further stated "it just is what it is" and wished Plaintiff luck.

42. An unknown Assistant District Attorney was then assigned responsibility for drafting the accusatory instrument. At 7:00 p.m. Defendant Titterton faxed to "Queens Intake 3" a signed accusatory instrument that did not include the allegations that AB had hit and kicked Plaintiff even though AB had stated to Defendant Titterton ten days earlier that she had done so and written down for Defendant Titterton that AB "slapped and hit him."

43. At the arraignment, the Assistant District Attorney did not disclose that AB had been hitting and kicking Plaintiff and requested bail of $500 to be set. The Court denied the bail request and Plaintiff was released on his own recognizance.

44. At the second hearing, the Assistant District attorney stated that it was making a "Brady disclosure" that AB had been "kicking" Plaintiff.

45. In a subsequent hearing, the court held that the accusatory instrument contained incorrect information, namely the location of the incident. The Court ordered the District Attorney's office to file a corrected accusatory complaint.

46. The District Attorney's Office did not correct the accusatory complaint but instead offered an adjournment in contemplation of dismissal or "ACD" for six months pursuant to New York Criminal Procedure Law § 170.55

47. Plaintiff stated he would accept an ACD for four months and the Assistant District Attorney agreed.

48. After four months, the court dismissed the accusatory instrument against Platinff in furtherance of justice.

9

49. Prior to being offered the ACD, on March 3, 2015, Plaintiff went to the Special Victim's Unit in Manhattan and talked with non-party P.O. Francois. Plaintiff explained what had happened including the allegations made above in paragraphs 25-41 and bringing the email admissions by AB. After finishing the interview, P.O. Francois asked Plaintiff to wait while he checked out the available information to him. P.O. Francois subsequently allowed Plaintiff to file a cross-complaint against AB. P.O. Francois stated that the arrest of AB would be mandatory pursuant to state law.

50. The cross-complaint was subsequently sent to the 108th Precinct and assigned to a detective at that precinct.

51. On March 4, 2015, at approximately 11 p.m., Defendant Victor Castillo, a detective in the 108th Precinct, called Plaintiff. The Detective began by stating that the officer "should have never let this complaint be filed." Plaintiff responded by stating that he had admissions from AB. The Detective responded that "it did not matter" because "this was just not how it happened." Defendant Castillo also repeatedly violated state law by asking Plaintiff if he wanted to "press charges."

52. At Defendant Castillo's request, Plaintiff sent the evidence to him via email at his @nypd.org email address.

53. After Defendant Castillo subsequently refused to follow up on the case or return calls from Plaintiff, CCRB referred the matter to the Internal Affairs Bureau under case #201508346.

54. On September 20, 2015, Plaintiff emailed Defendant John Travaglia about the failure to follow up on the complaint against AB.

55. On October 1, 2015, the CCRB accepted a complaint against Defendant Travaglia and Defendant Castillo, which was then referred to IAB.

56. Plaintiff attempted many times to find out the status of the IAB case but received no significant information. On January 28, 2016, Plaintiff was told to contact Lt. Michael Bopp at the 108th Precinct. On February 1, 2016, Lt. Michael Bopp wrote Plaintiff: "Mr. Lehman, I am no longer assigned to the 108 Precinct. A supervisor from the 108 will be in contact with you." To date, no supervisor, or anyone else, has contacted Plaintiff to inform him of the status of the IAB investigation or why the complaint against AB was not followed up on.

57. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiff seeks to represent a certified Plaintiff class consisting of all persons who have been or will be subjected by the Queens District Attorney and NYPD in Queens County to Defendants' policy, practice and/or custom of selectively enforcing state law based on gender in cases involving domestic violence or handled by the domestic violence in violation of the Equal Protection Clause of the Fourteenth Amendment.

### FIRST CAUSE OF ACTION: SELECTIVE ENFORCEMENT IN VIOLATION OF THE EQUAL PROTECTION CLAUSE AGAINST ALL DEFENDANTS

58. Plaintiff repeats, reiterates and realleges the allegations set forth in the paragraphs above as if set forth fully herein and at length.

59. The Equal Protection Clause to the Fourteenth Amendment prohibits the selectively treated by law enforcement based on impermissible considerations.

60 Plaintiff, when compared with others similarly situated, was selectively treated and that such selective treatment was based on impermissible considerations such as race,

11

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

61. Gender constitutes an impermissible consideration in enforcing state law.

62. Plaintiff was selectively treated pursuant to a policy or custom of the City of New York, the NYPD and the Queen's District Attorney regarding the enforcement of state law in the County of Queens.

63. The gender-based enforcement of state law with regard to domestic violence and with respect Plaintiff was taken by municipal employees who, as a matter of state law, have final policymaking authority in the area in which the action was taken.

64. In addition, the custom or practice of this selective enforcement is so well-settled and widespread that the policymaking officials of the municipality have either actual or constructive knowledge of it and yet have nothing to end the practice.

65. The existence of this custom or practice in Queens County is permanent.

***Wherefore***, Plaintiff Brian Lehman respectfully demands judgment against the defendants named herein and a trial by jury in this action on each and every one of his claims and further request that this court issue:

a. a class-wide judgment declaring that the selective enforcement policy, practice and/or custom described herein is unconstitutional in that it violates the Fourteenth Amendment to the United States Constitution,

b. an order permanently enjoining defendants from continuing its policy, practice and/or custom as described herein;

c. the appointment of an independent monitor to assist the Court in ensuring that, if any pattern or practice is found to exist, it is effectively and sustainably remedied as well as

provide the Court with necessary information to assess whether any remedial measures this Court enters are actually resulting in a policy that is constitutional. Moreover, the appointment of an independent monitor would be essential to ensuring that the community of Queens, and New York City, has confidence in the reform process;

    d.    compensatory damages, where applicable and as to be determined by a jury at trial together with interest, costs and the disbursements of this action; and

    e.    award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice and, when applicable, award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S.C.§ 1988.

Dated: February 1, 2018

Respectfully submitted,

_____
Brian Lehman
244 5th Ave., Suite B258
New York, NY 10001
724-453-4626

Richard A. Brown
125-01 Queens Blvd.
Kew Gardens, NY 11451
Scott Kessler (same address)

City of New York
100 Church St.
New York, NY 10007

New York City Police
1 Police Plaza
New York, NY 10038

John Travaglia
Brian Titterton
Francisco ~~Marian~~ Maria
Victor Castillo

(same address